Southern Calif v. DePuy Synthes Was there any claim here that the invention was the discovery that you could have cross-linking without heat? I wouldn't say that the invention is the discovery of cross-linking without heat because that's a natural situation. The invention is the use of a cross-linking agent in the introvertible disk. It's not been done before. AXAN does not show that. The only teachings in AXAN have to do with things that are unrelated completely to the introvertible disk. So you're saying that AXAN doesn't disclose a cross-linking agent? It discloses a cross-linking agent, but it doesn't disclose a cross-linking agent injected into the spine, into the introvertible disk of the spine. Well, I thought we were past the injection limitation. I thought that was in COUNT2. This doesn't have an injection limitation. You're correct, Your Honor. We're not dealing with the limitation of injection versus simply contacting the nucleus propulsus or the angulus fibrosus. We're not dealing with that. The COUNT2 did not have these limitations of a peridine-linked cross-linkage. It did not have the limitation of being conducted the cross-linking being conducted without thermal treatment. And the reason those limitations were put in there was to distinguish specifically over AXAN. Now, if you go through, again, the prosecution history, you'll find that the examiner rejected the claims over AXAN in combination with another reference, which is not of significance here. And he also rejected the claim as being indefinite under 35 U.S.C. Wunschlaw's second paragraph. We overcame the application of AXAN with respect to the prior art. We overcame the rejection of AXAN by the incorporation of peridine-linked linkage. Those linkages are destroyed when you heat the material. We overcame that reference completely, but the examiner then continued to say that the claim was indefinite. Well, Dr. Hedman filed a declaration in which he explained that this was the normal condition to not use heat because heat is damaging to the nucleus osmosis and to the angus fibrosis of the material. And so based on that, in allowing the claims, there was a note put in there, and I can point you to that, in which the examiner said that in view of Dr. Hedman's declaration and some other matters, they withdrew the indefinite rejection and allowed the claims. So that's where we are. Okay, anything further you want to say for us? No, I'd be glad to provide some additional information. It's all in the brief. There's a complete listing of our research and time for the rebuttal. We'll save the rest of your time. Thank you, Mr. Berliner. Okay, thank you. Mr. Bretschneider. Thank you, Your Honor. May it please the Court. We are back here because of a remand, and the remand involved a situation where the Board did not provide a good enough explanation of why it would not let USC file a motion to get a new count. The Board gave USC exactly what it asked for, and it gave USC exactly what the Court said it should, a chance to file a motion. My question is whether there are grounds for not allowing the count or denying the motion is correct. Yes, that is correct, Your Honor. The count for was obvious. Actually, the position is a little bit more complicated than that. The first part of the position is that if you look at the motion itself, and then the Board's proceedings, they follow fairly strict rules, and neither side is arguing that the rules are invalid or improper. If you look at A436 and 437, you have the whole of the substance of their motion on one of the burdens that they must carry in order to prevail. As USC acknowledged on A436, the party moving to add or amend a count must show the count is patentable over the prior order. Then they acknowledge that. On the very facing page, A437, you see the entirety of their argument, which was count 4, which is identical to count 7, is patentable because claim 7 was allowed during ex parte prosecution. It has been settled for 40 years or more that the... What you're saying is the argument they're making here today wasn't made before the PTO? In part, that's correct, because it was made in the reply. It wasn't made in the motion. What's interesting is, and this... The business about inherency, I think, is really important here. Let's look a little further in their motion to page A441. And this is where I'm somewhat mystified by what's going on here. This is, I think, where the board had a problem. The board did not only rely on the burden of proof issue. The board also said, well, wait a minute. You've taken a position in this interference, which is inherently inconsistent. I beg the court's indulgence in using the word inherently. It's inherently inconsistent with the position you're taking. And if you look on 441, you see a discussion of the two limitations that are the big argument here. The pyridinyline cross-links. I think that's the correct pronunciation. I'm not much of a chemist. And conditions within physiological limits to prevent tissue overheating. These are the two limitations that were added to Claim 7 to distinguish it over Axan, according to USC in the prosecution. Yet you look on the motion here, and this is the same paper that they're filing to show that Count 4 is patentable over the prior art. And they say, well, gee, pyridinyline cross-links are inherent in the description of the collagenous tissue. And then they cite prior art. And they argue that this is inherent. They took this position initially because in the previous appeal, and this was not argued to the court, but it's mentioned in the briefs and mentioned by the board in this case, there was an issue of interference in fact. And the USC argued that DePue's claims were not patentable over its claims and vice versa. You have to have two-way unpatentability because the pyridinyline cross-links limitation and the physiological condition limitations in USC's claims were the usual circumstance. The board hit this directly in its original decision on page A18. And the board said, and this is where the Gross v. Plank and Lewis v. Okada citations that are in the briefs are relevant. I'll get to those if the court wishes. The court says, look, in this interference, it's on page A18, right under the law code, the board says in this interference the university has staked out positions that are inconsistent with the examiner's decision to allow Claim 7. So the board has gone beyond simply saying you can't rely on the ex parte allowance of Claim 7 and given this court additional grounds on which to affirm the board's decision. Specifically, both of the limitations that the university added to overcome the cited prior art are elements that the university contends are inherent or obvious. The examiner presumably would not have allowed Claim 7 if these admissions had been in the prosecution record. USC takes issue with this statement, but it is true. The other problem is procedurally the entire record to which the pew was responding was simply Claim 7 has been allowed, count 4 is a good count. And that was the end of it. So that from that perspective, we had nothing to respond to. In fact, we basically said so in our red brief. And in any event, the board had it right. On rehearing, the board explained it even more thoroughly, and I think that's at A3540, and we cited that in our brief. Another point to consider is the fact that the AXAN argument, not only was it not presented in support of the motion, which it should have been, it also is not correct for two reasons. Number one, USC does not address whether the board's analysis of AXAN was supported by substantial evidence. There's no joining of the issue here. What USC is saying is all AXAN is about is the fact that using heating is great. The prior art doesn't use heating. We use heating, that's our invention. But that's not what AXAN completely discloses. AXAN also discloses, and the board was right on this, the fact that, yeah, in the prior art, not using heating was known. So how could it have been non-obvious to do what the prior art did? Well, was the use of a cross-linking agent disclosed in the prior art? I'm sorry, Your Honor? Was the use of a cross-linking agent disclosed in the prior art? Per se, it was. It was, and that particular argument in any event was not presented. Is there a finding to that by the board? There didn't have to be on the original motion. The answer's no. Yes, the board said yes, it was no. It was no. The use of a cross-linking agent, where does it say that? I'm sorry, Your Honor? Where? Where does the board say that? The board says that in the original motion, the board says that this is on page A15. AXAN itself teaches that part of its invention was the combination of existing cross-linking and heat treatments. That's the finding by the board that AXAN discloses cross-linking. No, that wasn't my question. My question was, did the board find that the use of a cross-linking agent was in the prior art? What you just read me doesn't say that. Well, it says the board also... Actually, Your Honor, I beg to differ because what the board said is they said they read AXAN as teaching that cross-linking was an existing treatment, which means this is something... Where do they say that? On page A15. You'll see there are two bracketed paragraphs, 35 and 36, and the second line down is what I'm looking at. And the board cites a provision in AXAN to a passage... I'm sorry, I don't see to what you're referring. Are we talking about these bracketed paragraphs, 35 and 36? And then directly below that, there's a sentence. AXAN itself teaches that part of its invention was the combination of existing cross-linking. That's a finding by the board that AXAN disclosed cross-linking was something that existed. And then heat treatments. The problem, though, Your Honor, is that... Well, cross-linking existed, but the question is the use of a cross-linking agent in the prior art. Well, the problem, Your Honor, with that is that that's exactly the issue. Cross-linking agent is only part of the point. AXAN does disclose the use of cross-linking, and cross-linking can be carried out by radiation. It can be carried out by the use of cross-linking agents. But more importantly, this argument wasn't in their opening motion. It's all under pie, and that's not the way that the rules work. DePue, if it had been presented with AXAN and the patentability of Claim 7 over AXAN the way it should have been, would have been able to respond to this, and we didn't have that chance. We didn't have the chance to put in evidence, and that's the big problem. The other part of the problem here is that, if I may, I'd like to address briefly the issue of the missing documents because there was motion practice before the court on that. I just wanted to comment that USC should have been aware that there was something wrong from the Board's initial decision. If you look at A13, there's a statement and this is just above the bottom. The Board says, Regarding collagenous tissue having pyridoline cross-links, the University relies on a 1998 article that does not appear in the record, footnote 57. Footnote 57 refers to page 7 of the USC motion citing exhibit 1181. 1181 is in parentheses. It's obvious there's a problem. The real issue, though, before the court is, one, did the Board's failure to consider these documents really cause any prejudice to USC? I think in our briefing we demonstrated that it actually did not. And two, shouldn't they have exhausted their administrative remedy, as it were, by going to the Board and saying, what are you talking about? Furthermore, exhibits 1185 through 1188 were presented to the Board only on rehearing and not on the original motion. So they don't count either. I think in this case we have a clear failure simply to follow the rules. All of the other arguments are essentially beside the point. If the court has any questions about Lewis v. Okada or Gross v. Plank, I'd be glad to answer them. But if you do not, I'm finished. Okay. Thank you, Mr. Bretschneider. Thank you, Your Honor. Mr. Berliner. Clearly, my colleagues are relying upon the teaching of Aksan that there was a combination. What about his argument that he didn't raise this in the motion? The only thing he relied on was the fact that Claim 7 had been approved in the ex parte examination. The Board itself made prosecution of the application the main issue of this decision. Well, I don't care who made it the main issue. Is that the only issue you raised? No, that's not exactly true. We did talk about Aksan and we certainly talked about it all throughout this throughout the interference. No, but how about in this motion to add the count? Yes, and it's made in the context of dealing with the examiner's treatment of Aksan. So it was raised certainly because we argued about how the examiner dealt with the Aksan reference. There's no doubt about it that we demonstrated that the examiner correctly dealt with Aksan. So we're dealing with Aksan. And we dealt with it in the same way that we dealt with it when we dealt with the examiner. Where in the motion did you raise this question about Aksan? I'd have to get the motion you're on to look at that if you would give me a minute. Go ahead. My colleague has been kind enough to tag the pages. He tore out that page. I'm sorry? He tore it out before he gave it to me. Before he gave it to you. I understand. I don't think he'd do that. Never mind. I can't find it. We can look it up. Don't worry. I'm sorry? We can look it up afterwards. We don't want to waste all your time having you page through. I'd be glad to look at it a little further. But we talked about, obviously. Go ahead. Why don't you go on. Yeah. Thank you. My colleague refers to Luis Villacata, which sort of stood for the proposition that if your account exceeds the scope of the claims and prosecution, then you cannot rely upon the prosecution. Of course, here, as acknowledged by the board, it was identical. The claim seven is identical to count four. And so somehow or other, the board seems to think that, nevertheless, it was important because it was relying upon the inherency arguments that we had made. It turned out that we had filed certain exhibits. And your honors are aware of the fact that we had a hearing on that. Well, not a hearing, but a motion dealing with the fact that the board wanted to expunge these exhibits. And Judge Lowry made the decision that these exhibits should go forward. It was in these exhibits that we dealt with the question of why the examiner allowed the claims. The board proceeded on the basis that the examiner didn't allow the claims. Excuse me, that the examiner allowed the claims in ignorance that there were admissions of inherency. And that basis for that decision is not supportable. And I have my own pages marked off. And if you look at A998, you'll find that during the prosecution, Dr. Headman had filed a declaration. In that declaration, he talked about the fact that conditions within physiologic limits would be understood by those of ordinary skill in the art to mean that they're consistent with normal functioning. The examiner, in allowing those claims, along with the advisory action that accompanied the notice of allowance, on page A1020, stated, the after the final amendment has been entered, the declaration by, he called it, Mr. Thomas Headman and other affidavits have been considered. Advocates' arguments are persuasive and seem to overcome the rejection of 112. OK. I think, Mr. Berliner, we're about out of time. Thank you very much. Thank both counsel. The case is submitted. And that concludes our session for this morning. Thank you. All rise.